**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PEAK TECHNICAL SERVICES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-1568 |
| | § | |
| LAND & SEA ENGINEERING, LLC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION ENTERING FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

This dispute arises out of a contract between Peak Technical Services, Inc. ("Peak") and ODS Engineering, LLC ("ODSE"). Under the contract, Peak agreed to provide technical staff to ODSE to design three cranes for offshore oil platforms. ODSE contracted to pay Peak a fixed hourly rate for the time each Peak contractor worked. ODSE was designing the cranes to fill a purchase order from ODS International Inc. ("ODSI") which, in turn, was constructing the cranes as part of a larger project for Atwood Oceanics. ODSE and ODSI are separate companies owned by Richard Hancock. ODSE went out of business before paying Peak all the money Peak invoiced under the contract. ODSE failed to pay $123,341.06 of the over $500,000 Peak invoiced. Peak sued ODSE and ODSI.

Peak asserted that ODSE was liable for breach of contract. Although ODSE asserted that Peak's performance was deficient, there was no evidence of a material breach by Peak that would excuse or reduce its contractual obligation to pay. Peak asserted four theories of recovery against ODSI: (1) breach of contract; (2) promissory estoppel; (3) unjust enrichment; and (4) quantum meruit. As to the first theory, Peak argued that ODSI breached a contractual promise to guarantee

ODSE's debt. As to the second theory, Peak argued that it detrimentally relied on ODSI's promises to pay Peak for its work by continuing to supply contractors to work on the design project. As to the third and fourth theories, Peak argued that ODSI benefitted from the work Peak's contract engineers did on the crane-design project because it had been commissioned by ODSI's client, Atwood Oceanics.

This court held a two-day bench trial on August 22 and 23, 2011. The parties presented witnesses and introduced documents into evidence. Based on the testimony and exhibits, the parties' oral and written arguments, and the relevant law, this court finds and concludes that ODSE is liable for breach of contract for its failure to pay Peak $123,341.06 of the amounts invoiced, and that ODSI has no liability to Peak under either contract or quasi-contract theories for the unpaid invoiced amounts for work done by Peak contractors under the contract with ODSE. The specific findings of fact and conclusions of law are set out below.[1]

## I.     Findings of Fact

### A.     The Parties

Peak supplies engineering staff to clients under both long- and short-term contracts. John Salvucci is the account manager at the Irvine, California Peak office and Ben Seversky is the regional vice-president.

ODSI is an oilfield supply and service company that provides equipment and components for drilling rigs and production platforms used in oil and gas exploration activities worldwide. ODSI has been in business since 2002. Its headquarters are in Houston, Texas. Richard Hancock is the

---

[1] To the extent any of the conclusions of law is a finding of fact, it should be considered as a finding of fact. To the extent any of the findings of fact is a conclusion of law, it should also be considered as a conclusion of law.

sole director and shareholder of ODSI and Mike Dunham is its finance manager.

ODSE[2] was a California engineering consulting and design firm. Hancock was its sole owner and managing member; Steven Curry was engineering manger; and Charles Kvitky was principal engineer. Curry ran ODSE's day-to-day operations until his employment was terminated in May 2009. After Curry left, Bob Armstrong, an ODSI employee, oversaw ODSE's operations.

ODSE was formed in the spring of 2008, when Curry and Kvitky approached Hancock and asked him for work. Rather than hiring them as ODSI engineers, Hancock decided to start a new company with an office in Fountain Valley, California—ODSE—and to hire Curry and Kvitky to work for that company. Before Hancock formed ODSE, Curry and Kvitky signed employment agreements with ODSI. Curry's agreement stated that "[ODSI] desires to employ [Curry] in the position of Engineering Manager for [ODSE]" and that "[Curry's] duties shall include, but not be limited to, all the normal duties associated with the above-described position with [ODSE] and all other responsibilities consistent with the duties of Engineering Manager assigned from time to time by the President of [ODSI]." (Def.'s Ex. 25). The agreement further stated that "[Curry] shall [have] no right and shall have no authority, to act as or represent himself as an agent of, or for, [ODSI] pursuant to the terms and conditions of [ODSI's] policies." (*Id.*). Kvitky's employment agreement substituted "Principal Engineer" for "Mechanical Engineer," but was otherwise identical. (Pl.'s Ex. 25). Hancock testified that ODSI was a party to the employment agreements because ODSE was a start-up company, but that Curry and Kvitky were never engineering managers or principal engineers of ODSI. Consistent with Hancock's testimony, Curry was paid by ODSE.

---

[2] ODSE later changed its name to Land & Sea Engineering, LLC. This opinion refers to both ODSE and Land & Sea as ODSE.

B.     **The Contracts at Issue**

In October 2008, ODSI issued a $475,192 purchase order to ODSE for the design of three cranes for offshore oil platforms. (Pl.'s Ex. 21). The cranes were part of ODSI's work under a contract with Atwood Oceanics. ODSI paid ODSE the full amount ODSE was due under the purchase order. Atwood Oceanics paid ODSI under their contract.

After receiving ODSI's purchase order, Curry contacted Peak, a company he had worked with in the past. Curry asked Peak to supply engineering personnel on a contract basis for the design project. ODSE and Peak signed confirmation agreements for each Peak contractor assigned to work on the project. The earliest confirmation agreement in the record is dated August 13, 2008 and the latest is dated February 6, 2009.[3] All the confirmation agreements identified ODSE as the contracting party. No agreement mentioned ODSI. Under the confirmation agreements, ODSE agreed to pay Peak a fixed rate for each hour worked by the contract engineers placed with ODSE. The agreements stated that Peak's invoices for the engineers' work were due on receipt and that interest at the rate of 1.5% per month would be added if they were not paid within fifteen days of the invoice date. The agreements also stated that Peak would be reimbursed for any costs, including reasonable attorneys' fees, incurred in collecting overdue invoices. (Pl.'s Ex. 1). Peak contractors worked for ODSE on the crane-design project from October 2008 until July 2009, when ODSE closed its California office and started winding up its business. No work was performed under the ODSE confirmation agreements after July 2009.

C.     **The Alleged Promise by ODSI to Guarantee ODSE's Payments to Peak**

---

[3] Although Peak contractors did not start working on the crane-design project until October 2008, the record indicates that Peak contractors were working for ODSE on other projects before that date.

From October 2008 to July 2009, Peak contractors filled out weekly timesheets, which they submitted to ODSE for approval. The timesheets identified ODSE as the client and did not mention ODSI. (Pl.'s Ex. 3). After the timesheets were approved—first by Curry, and after Curry left Peak, by Armstrong—Peak paid its contractors and billed ODSE for their work. All the Peak invoices identified ODSE as the client and did not mention ODSI. (*Id.*). After ODSE approved the Peak invoices, it forwarded them to ODSI for processing and payment.

ODSE and ODSI were parties to an intercompany services agreement under which ODSI undertook to provide various administrative services, including financial and accounting services, to affiliated entities. (Def.'s Ex. 2). Although ODSI processed Peak's invoices under this agreement, all payments to Peak were made from ODSE's bank account on ODSE checks.

Beginning in February 2009, Peak became concerned that ODSE was falling behind paying the Peak invoices. From then until July 2009, when Peak's contractors stopped working on the design project and when ODSE closed down its California office, ODSE paid Peak over half a million dollars. Even after ODSE started winding up its business, Peak received three checks from ODSE dated September 2009, October 2009, and February 2010. (Pl.'s Ex. 28). These payments were made by ODSE using funds that ODSI transferred. ODSI did not issue any checks or make any payments directly to Peak. ODSI made an accounting entry for every transfer of funds from ODSI to ODSE used to pay Peak's invoices. These accounting entries are consistent with ODSI's position that ODSE, not ODSI, was contractually obligated to pay the Peak invoices to ODSE. When Peak received its last payment from ODSE, $123,341.06 of the invoiced amounts remained unpaid.

At trial, Peak sought to prove its breach of contract claim against ODSI through testimony

and documents, specifically emails sent by Dunham and Hancock to Salvucci and Seversky. No witness testified that a written contract existed between Peak and ODSI. Salvucci, Peak's account manager, testified that he never entered into a verbal contract with anyone at ODSI and never told anyone at ODSI that Peak would pull its contractors unless ODSI guaranteed ODSE's payment of Peak's invoices. Salvucci could not recall anyone telling him that ODSI agreed that it would pay all amounts Peak invoiced ODSE. Curry testified that he never entered into a contract with Peak on ODSI's behalf. Seversky, Peak's regional vice-president, testified that he was not aware of any written contracts between Peak and a Hancock-owned entity other than the confirmation agreements between Peak and ODSE. Seversky could not recall receiving any emails from Dunham or Hancock at ODSI stating that ODSI would assume responsibility for the Peak invoices. Dunham and Hancock testified that ODSI never agreed to guarantee ODSE's debt and that Peak never asked ODSI to do so. Peak's witnesses testified that Dunham and Hancock never told them that Peak would not be paid, but this testimony does not reflect a promise by ODSI to guarantee payment of Peak's invoices to ODSE.

The emails reveal the following:

- In February 2009, Salvucci and Dunham participated in a conference call and discussed ODSE's outstanding obligations. (Def.'s Ex. 7). After the call, Salvucci wrote an email to Dunham thanking him for his time and asking him to send payment for Peak's most recent work, as well as for older invoices. Salvucci stated that "[i]deally, the amount of outstanding monies shouldn't be more than 30-40 days, [and] we are currently far beyond that as we discussed." (Def.'s Ex. 8).

- Salvucci and Dunham exchanged numerous emails in which Peak requested information

about upcoming payments.  For example, in a March 2, 2009 email, Salvucci asked Dunham to "provide the check amount and check #, for tomorrows [sic] Fed. Express delivery." (Pl.'s Ex. 5).  Dunham replied: "John, check # 10427 for $74,986.22.  Thanks." (*Id.*).  On March 18, Salvucci again asked Dunham for payment details.  Dunham apologized for not being able to send a payment that week and indicated he hoped to send a payment next Monday.  (Pl.'s Ex. 6).  When Salvucci asked for payment details on March 23, Dunham wrote: "John, will have payment out to you tomorrow and will forward details at that time. Thanks." (*Id.*).  The next day, Misty Hill, an ODSI accountant, wrote to Salvucci: "Check #10436 for $75,441.10 was sent FedEx today." (*Id.*).  Peak received ODSE checks 10427 and 10436 as specified in the emails.  (Pl.'s Ex. 28).

- On April 13, 2009, Dunham apologized for lack of prompt payment and indicated that payment was forthcoming.  The email stated: "John, sorry for the late response and the lack of payment.  I believe we are currently in arrears $133k of which we will pay $100k this Friday and the balance the following Wednesday and that should get us caught up.  From that point forward we will simply pay our weekly invoices.  Thanks for the patience." (Pl.'s Ex. 7).

- At the end of April 2009, ODSE had paid most of its outstanding invoices to Peak, but not all.  Salvucci stated in an email to Dunham: "My sincerest apologies.  I was just informed that we are about current, thanks for taking care of this.  Please disregard the last email. Please let me know details on the next check, amount, date to be sent, thanks." (Def.'s Ex. 12).

- In August 2009, Dunham apologized for late payments and explained that ODSI was waiting

to receive payments from its clients before ODSE could pay Peak. "John, I am sorry I missed your phone call and I apologize for the delinquency of our payment. We were expecting a large payment on the project that most of your folks worked on, which was earmarked to get your account caught up. Instead of a payment, we received a long list of items related to new work on the project that are totally unrelated to the amounts due . . . . [W]e are doing everything we can to get you paid." (Pl.'s Ex. 9). Salvucci thanked Dunham for his "detailed explanation" and asked whether "there [is] any way [Peak] could be paid along the way, say an invoice at a time." (*Id.*). Salvucci explained, "there are upwards of $60k, past due north of 60 days, and getting older with every week that passes. If there is a way to get, even partial invoices paid every week, it would show some diligence, that you are doing everything possible to decrease the total amount due." (*Id.*). Dunham replied: "John, we should be able to get you a check for a couple of invoices by Thursday of this week. Will drop you a line with the invoice #s, Check # and amount when it goes out." (*Id.*). The following week, after Salvucci informed Dunham that he had not received any information from Dunham about payments, Dunham apologized and explained that ODSI had still not been paid: "John, sorry we still have not been paid. I will definitely get you some money on Friday. Will confirm amount in the morning." (*Id.*).

- On September 10, 2009, Salvucci wrote to Hancock: "PEAK's employees finished the week of 7/11/09, per Bob Armstrong's request. Since that time, PEAK hasn't received monies due, the current balance is approx. $ 222,341.00, with these labor cost invoices dating back to 5/22/09. Mike Dunham has promised us some payment, but have yet to receive any. I appreciate any perspective you could provide, and any payment towards the balance, would

8

  be very much appreciated." (Pl.'s Ex. 10). Hancock replied: "I arrived back today from oversea's [sic]. I will meet with Mike early next week and provide details." (*Id.*).

- On September 21, 2009, Dunham wrote to Salvucci to propose a payment plan: "John, beginning today we will begin paying one invoice per week until we get you caught up. I am sorry we can't move this along quicker, but with the state the company was left in we are having to rely on cash flow from other entities to cover the deficit. Thanks." (Pl.'s Ex. 11). The following day, Seversky wrote to Hancock to confirm Dunham's email: "We at Peak Technical have reviewed Mike Dunham's proposal to pay Peak on an ongoing basis one invoice per week until the balance is down to zero. We will be willing to accept this longer term payment plan as long as we can get your full 100% commitment behind this plan schedule. This way we can be assured of receiving ongoing weekly payments from [ODSI] against this large balance of over $220,000." (*Id.*)

- ODSE did not follow the payment plan Dunham had outlined to Salvucci. On January 22, 2010, Seversky wrote to Hancock and threatened legal action. "I have left you a number of messages concerning the urgency of getting payment to us on your long outstanding balance. We must keep our lines of communication open. Please respond to my request or we will have no other choice but to go legal in order to recover our wages paid and cost on the Atwood Drilling project that our engineers were working on thru [ODSI] at your [California] location." (Pl.'s Ex. 12). Two days later, Hancock replied that ODSI was awaiting payment from a client. "Sorry for not responding. We actually stopped some equipment been shipped out last week due to our clients slow paying. As a result they confirmed a transfer will take place on 25th. Let's talk on 25th and I will confirm amount to be transferred to

9

Peak." (*Id.*).

- As of February 1, 2010, Peak had not received any payment from the transfer of funds ODSI expected to have received on January 25. On February 4, Seversky proposed a new payment plan and again threatened legal action. Dunham replied: "Ben, this is agreeable. To clarify, prior to the end of February, March, April & May we will make monthly payments to Peak in the amount of $41,280. We will more than likely make incremental payments throughout the month to smooth our cash flow, but prior to the end of each month we will meet the $41,280 monthly target." (Pl.'s Ex. 13).

- Using funds transferred to it by ODSI, ODSE made its February payment under the new payment plan, but did not make a payment in March. (Pl.'s Ex. 28). On April 6, 2010, Dunham wrote to Seversky: "Ben, I am sorry I missed your call I was on spring break the last week. As far as the March payment we failed to make, we are expecting payments from clients next week and if you can give me until next Friday we will be able to get back on schedule. Please let me know if this is agreeable to you." (Pl.'s Ex. 15). Seversky replied: "Our attorney has demanded, on our behalf, the $123,841.06 by next Friday, April 16th. If you get us $41,280 by Monday, April 12, we will agree to wait until April 30 for the next monthly payment." (Pl's Ex. 16).

- After contacting Peak's attorney, Dunham offered to send a $20,000 check. "Ben, your attorney said we could revert to the original payment plan if we got you a good faith check of $20k today and the balance of March by next Friday? The check for $20k went out about and [sic] hour ago. Let me know your thoughts." (Pl.'s Ex. 18). Seversky agreed to the terms proposed in Dunham's email, but Peak never received ODSE's check. (Pl.'s Ex. 19).

- Dunham testified that the $20,000 check was intended to go to Peak but was sent to the wrong address. The evidence reflects that ODSE issued Peak a check for $20,000 and that a different entity deposited the check. (Pl.'s Ex. 29).

• When the $20,000 check did not arrive, Seversky emailed Dunham and demanded payment. Seversky's email stated: "It has been almost a week now and your $20k check has still not arrived. We have seen no money for your March payment and the April payment is due this Friday 4/30/10. We have not received any money from ODS since 3/01/10. Please forward your March payment check of $41,280 and your April payment check of $41,280 via FedEx today." (Pl.'s Ex. 20). Hancock replied the following day: "Please accept our apologies, this is not deliberate. It is and will always remain our intent to pay PEAK in full for the services it has completed but until our clients start releasing payments to us we are struggling. We should have received a payment last week but our client changed their system which is having technical issues. Again, I do apologize and thank you for your patience, it is appreciated." (*Id.*).

The emails contain no statement from Peak that it would stop supplying contractors to ODSE unless ODSI guaranteed ODSE's payment of Peak's invoices. The emails do not mention ODSI other than in the electronic signature of the sender. The emails do not state that ODSI will assume or guarantee ODSE's contractual obligation to pay Peak's invoices. The emails are consistent with ODSI's position that it provided financial and accounting services to ODSE under the intercompany services agreement. The emails do not support the argument that ODSI guaranteed the payment of the invoices Peak sent to ODSE.

The record evidence does not show that Peak relied on any written or verbal promise by

ODSI that amounts invoiced to ODSE would be paid by ODSI. Before July 9, 2009, the last date Peak contractors worked on the crane-design project, there were no oral representations by ODSI employees stating that ODSI would guarantee ODSE's payment of Peak's invoices. Nor is there any written statement by ODSI that it would guarantee the payment of the invoices to ODSE for work done under Peak's confirmation agreements with ODSE. There is no basis to find that when Peak provided contract employees to ODSE before July 2009, Peak detrimentally relied on any promise by ODSI to pay ODSE's contractual obligations to Peak. Because Peak engineers did not do any work for ODSE after July 2009, Peak could not have detrimentally relied on any statements made by ODSI about payment after that date.

Peak submitted evidence that ODSI benefitted from the contractors' work—because the crane-design project was part of ODSI's larger project for Atwood Oceanics—but Peak has not submitted evidence showing that ODSI procured a benefit by fraud, duress, or the taking of undue advantage. ODSI paid ODSE the full amount specified in the purchase order. There is no evidence that ODSI caused ODSE to go out of business or that Hancock created ODSE for the purpose of incurring debt and insulating ODSI from liability. And ODSI transferred funds to ODSE even after ODSE closed down its office so that ODSE could pay some of the amounts Peak had invoiced. There is no basis to find that ODSI was unjustly enriched as a result of the Peak contractors' work that was invoiced but not paid.

The services Peak contractors performed for ODSE were covered by an express contract. Each contractor's work was covered by a confirmation agreement between Peak and ODSE. There is no basis to find that ODSI is liable to Peak under a quantum meruit theory.

**II.     Conclusions of Law**

**A.     Breach of Contract**

To succeed on a breach of contract claim, the plaintiff must prove: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Smith Int'l, Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007); *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). The elements of a valid contract are: (1) an offer; (2) an acceptance; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Roman v. Roman*, 193 S.W.3d 40, 50 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).

Peak cannot recover against ODSI for breach of contract because Peak failed to prove the existence of a valid contract between Peak and ODSI. The evidence establishes that there was a written contract between Peak and only one Hancock-owned entity: ODSE. The confirmation agreements were signed by ODSE; the timesheets filled out by the Peak contractors listed ODSE as the client; and Peak's invoices listed ODSE as the client. ODSI was not mentioned in these documents. Peak's invoices were paid by checks issued from ODSE. Peak's witnesses testified that they were not aware of any other written agreements between Peak and a Hancock-owned entity other than the confirmation agreements between Peak and ODSE.

There was no contract by ODSI to pay ODSE's debt in return for Peak's assurance that it would continue to supply contractors to do the design work ODSE had contracted to provide with ODSI for the Atwood Oceanics project. Neither witness testimony nor the parties' documentary evidence shows the existence of such a contract. The checks to Peak were ODSE checks. The evidence that ODSI transferred funds to its affiliated company, ODSE, to pay some of the Peak

invoices does not establish a contract to guarantee or pay the amounts Peak invoiced ODSE. Without evidence of a contract between Peak and ODSI, Peak cannot recover on its breach of contract claim against ODSI. Peak is entitled to recover on its breach of contract claim against ODSE, in the principal amount of $123,341.06.

### B. Promissory Estoppel

"The elements of a promissory estoppel claim are: (1) a promise; (2) reliance thereon that was foreseeable to the promisor; and (3) substantial reliance by the promisee to his detriment." *Lozada v. Farrall & Blackwell Agency, Inc.*, 323 S.W.3d 278, 291 (Tex. App.—El Paso 2010, no pet.). Peak argues that ODSI is liable under promissory estoppel because Peak detrimentally relied on ODSI's promise to pay Peak's invoices by continuing to supply contractors. ODSI did not promise to pay Peak's invoices to ODSE before July 9, 2009, the last date Peak contractors worked on the crane-design project. There is no statement that ODSI will guarantee the payment of the invoices to ODSE. Peak did not rely on any guarantee by ODSI to pay the unpaid amounts Peak invoiced to ODSE when Peak continued to have contractors work under the confirmation agreements before July 2009. Because Peak was no longer supplying contractors when the post-July 2009 emails were sent, Peak could not detrimentally rely on them. Peak cannot recover against ODSI on a promissory estoppel claim.

### C. Unjust Enrichment

"Unjust enrichment occurs when the person sought to be charged has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied). "A party may recover under the unjust enrichment theory when one person has

obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). "Unjust enrichment is not a proper remedy merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall." *Id.* at 42 (internal quotation marks omitted). ODSI did not obtain a benefit from Peak by fraud, duress, or the taking of undue advantage. Without evidence of fraud, duress, or undue advantage, Peak cannot recover on its unjust enrichment claim. *See TSBA, Inc. v. Perkins Ins. Agencies, LLP*, No. 11–10–00170–CV, 2011 WL 1196035, at *4 (Tex. App.—Eastland 2011, pet. struck).

### D.     Quantum Meruit

"Quantum meruit is an equitable theory of recovery based on an implied agreement to pay for benefits received." *Collins & Aikman Floorcoverings, Inc. v. Thomason*, 256 S.W.3d 402, 407 (Tex. App.—San Antonio 2008, pet. denied). To recover under quantum meruit, the plaintiff must prove that: "(1) valuable services were rendered; (2) to the party sought to be charged; (3) which services were accepted by the party sought to be charged; (4) under such circumstances as reasonably notified the recipient that the plaintiff, in performing such services, expected to be paid by the recipient." *Id.* at 407–08. "Generally, a party may recover under quantum meruit only when there is no express contract covering the services or materials furnished." *Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). "This rule not only applies when a plaintiff is seeking to recover in quantum meruit from the party with whom he expressly contracted, but also when a plaintiff is seeking to recover 'from a third party foreign to the original [contract] but who benefitted from its performance.'" *Pepi Corp. v. Galliford*, 254 S.W.3d 457, 462

(Tex. App.—Houston [1st Dist.] 2007, pet. denied) (quoting *Hester v. Friedkin Cos., Inc.*, 132 S.W.3d 100, 106 (Tex. App.—Houston [14th Dist.] 2004, pet. denied)).

In *Galliford*, the defendant hired a contractor to construct a restaurant and the contractor, in turn, hired Galliford to perform electrical work. 254 S.W.3d at 459. The contractor never paid Galliford and filed for bankruptcy two years after the electrical work was completed. *Id.* Galliford sued the defendant, who owned the property on which the restaurant was built, and sought to recover under quantum meruit. *Id.* at 459–60. The court explained that "[a] plaintiff seeking to recover the reasonable value of services rendered or materials supplied is precluded from recovering in quantum meruit if there is an express contract *that covers those services or materials* and if no exception to the general rule applies." *Id.* at 462. Because Galliford entered into a contract with the contractor for the work performed on the defendant's property, the court held that Galliford was barred from recovering under quantum meruit. *Id.*

As in *Galliford*, Peak entered into a contract with ODSE that covers the work performed by Peak's contractors. This contract bars Peak's claim unless one of the "three exceptions to the general rule that an express contract bars recovery under quantum meruit" applies. *Id.* "First, recovery in quantum meruit is allowed when a plaintiff has partially performed an express contract but, because of the *defendant's* breach, the plaintiff is prevented from completing the contract." *Truly v. Austin*, 744 S.W.2d 934, 936 (Tex.1988). This exception does not apply because Peak has fully performed under the contract and because ODSI is not the breaching party. Second, "[r]ecovery in quantum meruit is sometimes permitted when a plaintiff partially performs an express contract that is unilateral in nature." *Id.* at 937. This exception does not apply because Peak entered into a bilateral contract. "Third, a breaching plaintiff in a construction contract can recover the

16

reasonable value of services less any damages suffered by the defendant if the defendant accepts and retains 'the benefits arising as a direct result of the plaintiff's partial performance.'" *Galliford*, 254 S.W.3d at 463 (quoting *Truly*, 744 S.W.2d at 937). This exception does not apply; Peak neither partially performed nor breached its contract with ODSE . Because no exception applies, the confirmation agreements bar Peak's recovery under quantum meruit.

### III.     Conclusion and Order

ODSE breached its contract with Peak by failing to pay for all of the time its contract engineers worked on the crane-design project under the confirmation agreements. ODSE must pay Peak $123,341.06 plus prejudgment interest at the rate of 1.5% per month calculated from July 15, 2009, thirty days after the average date of Peak's outstanding invoices. ODSI is not liable to Peak under either contract or quasi-contract theories. Peak's claims against ODSI are dismissed with prejudice.

Counsel are directed to submit a proposed final judgment consistent with these Findings of Fact and Conclusions of Law no later than September 15, 2011.

SIGNED on September 6, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge